# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

TEOFILA OCHOA LIZARBE, et al.    \*
    \*
       Plaintiffs    \*
    \*
v.    \*      Civil No. PJM 07-1809
    \*
JUAN MANUEL RIVERA RONDON    \*
    \*
       Defendant    \*

# O P I N I O N

## I.
### Introduction

Teofila Ochoa Lizarbe, individually and as representative of the estates of

certain of her relatives,[1] and Cirila Pulido Baldeon, individually and as representative of

the estates of two of her relatives,[2] have sued Juan Manuel Rivera Rondon, pursuant to

the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, and the Alien Tort Statute

(ATS), 28 U.S.C. § 1350.  The suit arises out of actions that Rivera Rondon allegedly

---

[1]    Teofila Ochoa Lizarbe sues in her individual capacity and as the foreign representative of the estates of Silvestra Lizarbe Solis, Gerardo Ochoa Lizarbe, Victor Ochoa Lizarbe, Ernestina Ochoa Lizarbe, Celestino Ochoa Lizarbe, and Edwin Ochoa Lizarbe.

[2]    Cirila Pulido Baldeon sues in her individual capacity and as the foreign representative of the estates of Fortunata Baldeon Gutierrez and Edgar Pulido Baldeon.

took while serving in the Peruvian army in 1985 in the Department of Ayacucho in South Central Peru.  The suit proceeds in seven counts:

1) Count I (Extrajudicial Killing in Violation of the Torture Victim Protection Act, 28 U.S.C. § 1350);

2) Count II (Torture of Plaintiffs in Violation of the Torture Victim Protection Act, 28 U.S.C. § 1350, and the Alien Tort Statute, 28 U.S.C. § 1350);

3) Count III (Torture of Decedents in Violation of the Torture Victim Protection Act, 28 U.S.C. § 1350, and the Alien Tort Statute, 28 U.S.C. § 1350);

4) Count IV (War Crimes Against Plaintiffs in Violation of the Alien Tort Statute, 28 U.S.C. § 1350);

5) Count V (War Crimes Against Decedents in Violation of the Alien Tort Statute, 28 U.S.C. § 1350);

6) Count VI (Crimes Against Humanity Against Plaintiffs in Violation of the Alien Tort Statute, 28 U.S.C. § 1350); and

7) Count VII (Crimes Against Humanity Against Decedents in Violation of the Alien Tort Statute, 28 U.S.C. § 1350).

Rivera Rondon has filed a Motion to Dismiss, arguing (1) ouster of the Court's jurisdiction by reason of his deportation back to Peru; (2) statute of limitations; (3) immunity from suit under the Foreign Service Immunities Act of 1976 (FSIA), 28

U.S.C. §§ 1602-1611; (4) failure to exhaust remedies available in Peru; (5) non-

justiciable political question; (6) applicability of the act of state doctrine; (7) failure to

state a cause of action, and (8) lack of standing.

## II.
## Factual Background and Summary of Arguments

The Complaint makes these allegations:

The towns of Accomarca and Quebrada de Huancayoc are located in the

district of Accomarca, situated within the Department of Ayacucho, a mountainous region

in south central Peru.

Throughout 1980 to 2000, Peru was in a state of civil war, with

Government forces fighting a Maoist rebel group known as Sendero Luminoso ("Shining

Path" in English). Some of the fighting was concentrated in the Ayacucho Department.

Reportedly, both the Peruvian military and the rebel group committed widespread abuses,

massacres, bombings and assassinations during their struggle.

In 1983, the Peruvian Army began targeting the district of Accomarca,

claiming that Sendero Luminoso had gained a foothold there.  In consequence, the Army

raided homes in the district, killing civilians suspected of supporting Sendero Luminoso.

In or about August 1985, General Orzo, chief of the Political-Military Command in the

region, ordered Lieutenant Medina to convene a meeting to devise an operational plan to

"capture and/or destroy terrorist elements in Quebrada de Huancayoc."  Rivera Rondon,

at the time a Lieutenant in the Army, was present at the meeting where the operation was

discussed, where it was decided that his unit, along with a unit commanded by Lieutenant

Hurtado, would be deployed to the region.

On or about August 14, 1985, Hurtado's unit positioned itself in the town of

Quebrada de Huancayoc and, during the course of the day, despite finding no weapons or

traces of Sendero Luminoso, tortured, raped and killed villagers, including several women

and children.  From their hiding place, Plaintiffs, who were children at the time,

witnessed the abuse and murders of their families and other villagers.  Thereafter

Plaintiffs managed to escape the military forces.

Rivera Rondon's unit was stationed a short distance from that of Hurtado.

During the carnage, Rivera Rondon's unit allegedly fired shots, burned houses, and

blocked a possible escape route for the villagers. Though the abuse continued for many

hours and though Rivera Rondon's unit possessed a radio, he never contacted his

superiors about the abuses in progress and after the events, along with Hurtado, filed

reports which failed to mention any torture or murder of civilians.

Toward the end of 1985, the Peruvian Senate interviewed eyewitnesses and

reached the conclusion that 69 civilians had been killed in what became known as the

"Accomarca Massacre."  The Peruvian Supreme Court eventually delegated the case to

the military as opposed to civil justice system, which subsequently dismissed all charges

against military personnel, including Rivera Rondon, who was later promoted by the

Army.

In 1995, the Government of Peruvian President Alberto Fujimori passed a law granting amnesty to all members of the military, Rivera Rondon and Hurtado included, for police actions taken as part of fighting terrorists, making the amnesty retroactive to 1980. At the same time, widespread killings by Army forces continued throughout the country during Fujimori's presidency. In 2000, however, the Fujimori Government was replaced and the amnesty law repealed. In 2005, Peruvian prosecutors filed criminal charges against Rivera Rondon, Hurtado, and others for their involvement in the Accomarca Massacre. However, because from 1992 or 1993 until August 2008, Rivera Rondon was absent from Peru, the criminal case against him in Peru could not go forward.

As of the date the suit was filed in this Court, Rivera Rondon was residing in Montgomery County, Maryland, where he was served with process. He was eventually detained by U.S. immigration authorities and in August 2008 deported to Peru where, the Court understands, he remains in custody.

### III.
### Standard of Review

In considering a motion to dismiss, the court must accept the material facts alleged in the complaint as true. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Generally speaking, the issue posed by the motion is whether the facts alleged, taken as true and without reference to facts beyond those alleged, state a cognizable cause of action. However, to the extent that the motion challenges subject

matter jurisdiction pursuant to Rule 12(b)(1), evidence outside the four corners of the complaint may be considered without turning the motion into one for summary judgment. *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).  Similarly, to the extent that the motion is based on claims of foreign sovereign immunity, "the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case…" *Id.* (internal citations and quotations omitted).

## IV.
### Whether the Court Lost Jurisdiction Over Rivera Rondon Following His Deportation

### A.

Rivera Rondon first suggests that the Court lost jurisdiction over the case when U.S. immigration authorities deported him to Peru on August 15, 2008.  He argues that no statute gives a U.S. court jurisdiction over a foreign national who is in his home country for actions taken in that country under the circumstances of a case such as this. He further points out that the TVPA provides that "[a] court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  28 U.S.C. § 1350(2)(b).  Because administrative remedies in Peru have presumably become available, says Rivera Rondon, the case should be dismissed pursuant to this provision.

### B.

Plaintiffs argue that Rivera Rondon was duly served with process in Montgomery County, Maryland, at a time when he was a permanent resident alien residing there and where, they note, he owned real property.  That, they say, sufficed to establish the Court's personal jurisdiction over him.  *See, e.g., Cape v. von Maur*, 932 F. Supp. 124, 126-27 (D. Md. 1996).  They argue that jurisdiction is not lost by a party's involuntary departure from the United States, citing *United States v. Campos-Serrano*, 404 U.S. 293, 295 n.2 (1971), *superseded by statute on other grounds*, 18 U.S.C. § 1546. *See also Filartiga v. Pena-Irala*, 577 F. Supp. 860, 865 (E.D.N.Y. 1984), *after remand*, 630 F.2d 876, 879-80 (2d. Cir. 1980) (damages imposed on defendant after deportation, where defendant initially served in U.S. pending deportation).

## C.

The Court agrees with the authorities cited by Plaintiffs.  It did not lose jurisdiction over Rivera Rondon when he was deported.  More will be said on the matter of exhaustion of domestic remedies in Part VII of this Opinion.

## V.
## Whether the Claims Are Barred by the Statute of Limitations

## A.

Rivera Rondon next claims that the statutes of limitations under the TVPA and ATS bar Plaintiffs' claims and that equitable tolling of the statutes is unwarranted.

Subject to equitable tolling, the TVPA allows ten years from the time the underlying events occurred for a plaintiff to bring claims and, by analogy, a similar period

of limitations has been applied to ATS cases.  *See, e.g., Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 119 (D.D.C. 2003).  Rivera Rondon argues that since the actions giving rise to Plaintiffs' claims occurred in 1985 and the present lawsuit was instituted in 2007, it surpasses limitations under both Acts by 12 years.

Plaintiffs, who have the burden of proof on the issue,[3] contend that equitable tolling should apply.

## B.

1)   Equitable tolling delays the running of limitations in cases "where – due to circumstances external to the party's own conduct – it would be unconscionable to enforce the limitations period against the party and gross injustice would result." *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (internal citations omitted). Legislative history reveals that the Senate and House committees recognized the importance of tolling for claims brought under the TVPA. Accordingly, subsequent to passage of the Acts, courts have routinely applied the doctrine when it appears that plaintiffs had no reasonable opportunity to pursue claims as a result of civil war, violence, imprisonment, and repressive and brutal acts against society.  In *Arce v. Garcia*, 434 F.3d 1254, 1263-64 (11th Cir. 2006), for example, the Eleventh Circuit affirmed a finding of equitable tolling from 1979 to 1992 based on "abductions, torture, and murder by the military . . . [and] a judiciary too meek to stand against the [Salvadoran] regime."  Similarly, in *Chavez v.*

---

[3]   *See Arce v. Garcia*, 434 F.3d 1254, 1261(11th Cir. 2006).

*Carranza,* 407 F. Supp. 2d 925, 929 (W.D. Tenn. 2004), the district court applied

equitable tolling from 1979 to 1994 because the plaintiffs reasonably feared reprisal in El

Salvador if they complained about the murder, torture, and rape that had occurred there

during the civil war. *See also Jean v. Dorelien*, 431 F.3d 776, 779-80 (11th Cir. 2005);

*Papa v. United States*, 281 F.3d 1004, 1012-13 (9th Cir. 2002).

      To be sure, the Supreme Court has stated that equitable tolling should be

used sparingly and that federal courts must be "less forgiving" when a claimant has failed

to preserve legal rights by exercising due diligence. *Irwin v. Dept. of Veterans Affairs*,

498 U.S. 89, 96 (1990). Similarly, the Fourth Circuit, in *Harris v. Hutchinson*, 209 F.3d

325, 330 (4th Cir. 2000), has held that equitable tolling "must be reserved for those rare

instances where - due to circumstances external to the party's own conduct - it would be

unconscionable to enforce the limitation period against the party and gross injustice

would result."

      2)   According to Rivera Rondon, Plaintiffs were not constrained by outside

forces from bringing this suit within ten years. Indeed, they waited seven years to bring

suit after President Fujimori's repressive reign ended in 2000. Even during the Fujimori

presidency, there was no bar to suing Rivera Rondon. In fact, the Complaint concedes

that almost immediately following the Accomarca event, the Peruvian Senate issued its

condemnatory report, military and civilian investigations were held, the Peruvian

Supreme Court heard a case involving the alleged military brutality at Accomarca, and

two military court trials were conducted with respect to the event. All these events

occurred during the time that Plaintiffs suggest that their claims could not possibly have been investigated or suit filed.

Rivera Rondon also submits that Plaintiffs were on inquiry notice regarding any wrongdoing on his part by reason of the amount of publicity the Accomarca event generated.  *See Council v. Better Homes Depot, Inc.*, No. 04 CV 5620 (NGG)(KAM), 2006 WL 2376381, at *10 (E.D.N.Y. Aug. 16, 2006) (when proceedings involving a defendant's tort are recorded, plaintiff may be on inquiry notice and may not successfully invoke the equitable tolling doctrine).  Plaintiffs concede that they were eyewitnesses to the events.  This fact, coupled with the information that was available in 1985 regarding Accomarca, means they could have filed their claims at that time. Moreover, the Complaint does not allege any facts specific to any particular Plaintiff sufficient to show why that Plaintiff could not have investigated the events at issue or filed the present claim in 1985.

Rivera Rondon compares this case to *Van Tu v. Koster*, 364 F.3d 1196, 1199-1200 (10th Cir. 2004), where the plaintiffs, residents of Vietnam, relied on the ATS to bring an action against a defendant who allegedly committed atrocities in a Vietnamese village thirty-two years prior to the filing of the suit.  The Tenth Circuit refused to toll limitations for twenty-two years, despite the plaintiffs' poverty, residence in a communist regime, the Vietnam War, and inability to travel.  *Id.*  In this case, Rivera Rondon submits that there is even less reason to toll the statute of limitations.

-10-

3)   Plaintiffs insist that the allegations of the Complaint must be taken as true.  In this respect, they have pled that they feared that if they complained of the atrocities committed by Rivera Rondon, they faced retribution, persecution and death. Between 1985 and 2000, Peru was ruled by a repressive regime that suspended the country's constitution, relieved military generals of responsibility for any atrocities committed in the name of fighting terrorism, and routinely abducted and tortured civilians.  Since this regime persisted until 2000, by bringing the suit in 2007, Plaintiffs filed within the ten-year period of limitations.  Additionally, Plaintiffs believe limitations should be tolled, at least in part, because Rivera Rondon did not enter the United States until 1992 or 1993, when the U.S. courts were in a position to exercise jurisdiction over him, and because Plaintiffs did not attain the age of majority (18) until 1991.

Plaintiffs argue that the equitable tolling doctrine, as applied to cases brought under the ATS and TVPA, is different and distinct from traditional doctrine. They dispute the proposition that investigation into the Accomarca event by governmental entities in Peru provided them with sufficient basis to pursue their claims in Peru.  They object to Rivera Rondon relying on news sources outside the four corners of the Complaint, but, even then, submit that the investigations he refers to were futile because, all along, repressive governmental conduct continued and military officials under investigation were actually exonerated.

Plaintiffs argue that Rivera Rondon's reliance on *Van Tu* is misplaced. The *Van Tu* court, they say, dismissed the complaint because plaintiffs there had not alleged

that an official policy or conduct placed them in fear of their lives or that other external

forces prevented them from protecting their interests. 364 F.3d at 1198-1200.  These

factors, say Plaintiffs, are distinguishable from the facts in the present case.

## C.

The Court is satisfied that equitable tolling should be applied in this case.

Plaintiffs have pled that until at least the year 2000, the political climate in Peru was

unremittingly hostile to any effort on their part to pursue remedies against Rivera Rondon

in Peru.  There is every reason to believe that this was so.  The antiterrorist campaign

against Sendero Luminoso is widely understood to have continued until 2000, during

which time powerful elements of the Peruvian government maintained a vigorous defense

of the Armed Forces against charges of brutality.  During that period, moreover, the

Peruvian Supreme Court referred the investigation of alleged military brutality against

civilians to military rather than to civilian justice, where Rivera Rondon's purported co-

conspirator at Accomarca, Lieutenant Hurtado, while initially condemned by military

justice for his role in the killings, was the eventual beneficiary of the general amnesty for

military participants in the antiterrorist campaign, and even after the amnesty was

repealed, not only served no jail time for his crimes, but was promoted in rank by the

Army.  It was only in 2001 that the amnesty in favor of military personnel was declared

invalid, and only in 2003 that a Peruvian Truth Commission investigating Accomarca

issued its condemnatory report.

The Court concludes that the present suit, filed in 2007, came well within the 10-year limitations period for TVPA and ATS claims, as extended by equitable tolling. *Cf. Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154-55 (11th Cir. 2005) (statute of limitations in TVPA claim 26 years after the victim's death was properly tolled).

## VI.
## Whether Rivera Rondon is Immune From Suit Under the FSIA

### A.

Rivera Rondon next argues that the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 ("FSIA"), which grants a defendant immunity for actions taken pursuant to his official capacity on behalf of a foreign government, also blocks this suit against him. *See Velasco*, 370 F.3d at 398 ("courts have construed foreign sovereign immunity to extend to an individual acting in his official capacity on behalf of a foreign state"). He suggests that at all relevant times he was acting pursuant to directives of the Peruvian Government, not from personal motives. Plaintiffs dispute the applicability of the FSIA to this case.

### B.

A recent decision from the Fourth Circuit puts to rest the entirety of Rivera Rondon's FSIA arguments. In *Yousuf v. Samantar*, 552 F.3d 371, 381 (4th Cir. 2009), the court held that "based on the language and structure of the statute, ... the FSIA does not apply to individual foreign government agents." The court added that "even if an

individual foreign official could be an 'agency or instrumentality under the FSIA,'" he would not be considered such if he was not functioning in that capacity at the time suit was filed, *i.e.* an FSIA defense would not be available to one who was no longer an "agency or instrumentality" at the time suit was filed.  *Id.* at 383.

Notably, the defendant in *Yousuf*, Mohamed Ali Samantar, was the commander of armed forces in Somalia, allegedly responsible for acts of torture and other human rights violations committed by military personnel.  If the head of the military cannot avail himself of FSIA protection, *a fortiori* a line soldier such as Rivera Rondon cannot do so.  Moreover, the Fourth Circuit found no FSIA exemption despite the fact that "the current government in Somalia ... expressly adopted the position that Samantar's alleged actions were taken in his official capacity."  *Id.* at 376.  In marked contrast, in the present case, the Embassy of Peru has filed a letter with the Court stating that Rivera Rondon was <u>not</u> acting in his official position at Accomarca.[4]

### C.

That the Embassy of Peru has filed a letter in this case stating that Rivera Rondon was <u>not</u> acting in official capacity at Accomarca suffices, in the Court's view, to preclude dismissal of his claim that he was as a matter of law.  Apart from all else, the Court would observe that vigorous actions taken pursuant to an official or military policy of relentless pursuit of terrorists do not automatically equate to the massacre of women

---

[4]      Rivera Rondon has filed a Motion to Strike the Embassy letter, which the Court has denied.

and children, including infants, or the sexual abuse of the women, all matters alleged in the Complaint.

The FSIA does not prevent this case from going forward.

# VII.
## Whether Plaintiffs Have Failed to Exhaust Their Remedies Available in Peru

### A.

1)   The TVPA requires a plaintiff to exhaust available remedies in the place where the tort occurred, prior to suing in the U.S. 28 U.S.C. § 1350(2)(b). The statute also requires that the process available in a plaintiff's home country be "adequate and available." *Id.*

2)   Plaintiffs themselves, says Rivera Rondon, have demonstrated that adequate remedies for resolution of this dispute exist in Peru, since they concede that they have filed as "*partes civiles*" (civil parties) in the criminal proceeding that has been instituted against Rivera Rondon in Peru.[5] Although resolution of that criminal case may

---

[5]    *See* Carlos Tiffer Sotomayor, *La Posición Jurídica del Ofendido en el Derecho Procesal Penal Latinoamericano: Un Estudio de Derecho Comparado* ("*The Legal Status of the Victim in Latin American Criminal Procedure Law: A Study of Comparative Law*") (2001), *available at* http://www.cienciaspenales.org/REVISTA%2001/tiffer01.htm ("En la mayoría de países latinoamericanos, excepto en Brasil y Uruguay, los ofendidos pueden reclamar la indemnización y actuar en el proceso como parte, dentro del proceso penal, por medio de la 'action civile.' Sin embargo, el ofendido si lo prefiere, puede esperar que termine el proceso y posteriormente, reclamar sus derechos en la jurisdicción civil. Es decir, el ofendido en América Latina, tiene generalmente el derecho de escoger la vía procesal, sea la penal o civil.") ("In the majority of Latin American countries, except Brazil and Uruguay, victims can seek indemnification and participate as a party, within the criminal process, by means of the 'civil action.'  Nevertheless, if the victim prefers, he can wait until the process ends and thereafter make his claim in a civil proceeding.  That is, the victim in Latin America, generally has the right to choose the process, be it criminal or civil.")

take some time, he argues, this is not enough to demonstrate that Plaintiffs have exhausted the remedies available in Peru.  The TVPA requires only that the process be "adequate and available."  Plaintiffs have presented no argument that the timeline for adjudication of their claims or the compensation provided by a Peruvian court would not be adequate.

Alternatively, apart from participating in the criminal proceeding, there is a separate civil proceeding available in Peru that could be brought against him, and Plaintiffs do not claim that compensation provided by a Peruvian civil court would be inadequate.

3)   In response, Plaintiffs point out first that they have brought claims under both the ATS and the TVPA.  While the TVPA has an exhaustion requirement, the ATS does not.  Therefore there is no question that the ATS claim may go forward.  But even under the TVPA, exhaustion of remedies in the foreign forum is not required "when foreign remedies are unobtainable, ineffective, inadequate, or obviously futile." S. Rep. No. 102-249, pt. 4, at 10 (1991).  Under the TVPA, the defendant bears the burden of proving that available and adequate local remedies exist in Peru.  *Id.*  Plaintiffs argue that Rivera Rondon has not demonstrated that the remedies currently available are in fact adequate.  In Peru, a plaintiff cannot obtain a civil remedy until the criminal charges against defendant are adjudicated.  Criminal proceedings are invariably lengthy affairs, often stretching to years at a time.  So long as a criminal case is pending against a defendant in Peru, the only option for a civil plaintiff is to participate in the criminal

proceeding as a *parte civil*, where damages are recoverable only after criminal liability is assessed.  This makes their remedy in Peru ineffective and inadequate.

## B.

Plaintiffs are correct that the ATS contains no exhaustion requirement and no cases to date have implied one.  *See, e.g., Sarei v. Rio Tinto PLC*, 2007 WL 1079901, at *14-16 (9th Cir. April 12, 2007), *reh'g en banc granted*, 499 F.3d 923 (9th Cir. 2007); *Jean*, 431 F.3d at 781.  Additionally, they are correct that under the TVPA Rivera Rondon bears the burden of proof as to the availability and adequacy of the foreign remedies.  *See e.g. Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778, n.5 (9th Cir. 1996).[6]  The question is whether Rivera Rondon has shown that the remedies in Peru are "effective, obtainable, not unduly prolonged, adequate and not otherwise futile."  *Cf.* S. Rep. No. 102-249, at 10.

## C.

---

[6]

*See also* S. Rep. No. 102-249, pt. 4, at 10 (1991) ("The procedural practice of international human rights tribunals generally holds that the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use. Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.").

The Court finds that Rivera Rondon has not met his burden in this regard. The record is barren of any evidence that the criminal case against him is proceeding apace or that there is any reasonably foreseeable date for its conclusion. As a general proposition, it may be said that criminal proceedings in civil law countries such as Peru typically are not concentrated affairs, but are comprised of investigative, examining and trial phases over extended periods of time, sometimes lasting years. [7] Nor has Rivera Rondon established that the level of damages available to a *parte civil* in a criminal case in Peru is adequate – whether, for example, punitive damages are available, or, indeed, whether criminal court judges in Peru are sufficiently focused on, much less skilled in, assessing civil damages. Without in any way intending to pre-judge the issue, it bears noting that in granting the same Plaintiffs as sue here a default judgment against Rivera Rondon's alleged co-conspirator Hurtado, the U.S. District Court for the Southern Division of Florida awarded them some $37.0 million dollars in damages. *Lizarbe, et al.*

---

[7]    "The typical criminal proceeding in the civil law world can be thought of as divided into three basic parts: the investigative phase, the examining phase (the *instruction*), and the trial. The investigative phase comes under the direction of the public prosecutor, who also participates actively in the examining phase, which is supervised by the examining judge. The examining phase is primarily written and is not public. The examining judge controls the nature and scope of this phase of the proceeding. He is expected to investigate the matter thoroughly and to prepare a complete written record, so that by the time the examining stage is complete, all the relevant evidence is in the record. If the examining judge concludes that a crime was committed and that the accused is the perpetrator, the case then goes to trial. If he decides that no crime was committed or that the crime was not committed by the accused, the matter does not go to trial." John Henry Merryman, *et al.*, The Civil Law Tradition: Europe, Latin America, and East Asia, Cases and Materials 1064 (1994). A criminal trial in the civil law system "need not be continuous and may proceed sporadically over a year or more." Criminal Procedure: A Worldwide Study, at xvii (Craig M. Bradley ed., 2d ed. 2007).

*v. Hurtado*, Case No. 07-21783-Civ-Jordan (S.D. Fla. Mar. 4, 2008).  This Court has no basis for determining what items of damages are compensable under Peruvian law or whether a civil award against Rivera Rondon in Peru could begin to approach the level of the Florida District Court award, were he to be found liable.

Very few cases under TVPA appear to have been dismissed based on the failure to exhaust domestic remedies defense.  *See* Beth Stephens, *et al.*, Int'l Human Rights Litig. in U.S. Courts 405 (2d ed. 2008).  This is another that does not.

## VIII.
### Whether the Complaint Raises Non-Justiciable Political Questions

### A.

Rivera Rondon next argues that the Complaint raises nonjusticiable political questions, a notion Plaintiffs vigorously dispute.

### B.

1)   Political questions have traditionally been deemed inappropriate for resolution by courts.  The reasoning is that courts should decline to decide cases where the dispute presents issues constitutionally assigned to the political branches of government.  *Baker v. Carr*, 369 U.S. 186 (1962).

*Baker* enumerated six factors for a court to consider in determining the existence *vel non* of a political question, the presence of any one of which can serve as a basis for dismissing the claim. The factors include: (1) commitment of the question to a coordinate branch of government, (2) lack of judicially discoverable or manageable

standards for resolving the question, (3) the impossibility of deciding the question without an initial policy determination of a kind clearly appropriate for other than judicial discretion, (4) the impossibility of deciding the case without expressing a lack of respect due a coordinate branch of government, (5) an unusual need for adherence to a political decision already made, and (6) potential embarrassment that could arise from disparate pronouncements on the question by various departments of government.  *Id.* at 217.

2)   Rivera Rondon contends that several of these factors weigh against Plaintiffs' claims.

First, the executive branch in Peru is entrusted with the conduct of foreign affairs. During the 1980s, political branches of the U.S. Government, in conjunction with the Peruvian executive, provided training to the Peruvian Army to help the country fight terrorist groups. Adjudicating this case would therefore involve evaluation of the U.S. foreign policy decision to aid Peru.

Second, the judiciary has no manageable standards to resolve this case because it implicates a military judgment of the executive branch. For instance, in *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997), Turkish sailors sued the United States for injuries after an aircraft carrier mistakenly attacked their ship during a training exercise. The court found that resolution of the case involved a political question because courts lacked standards to decide whether "reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Id.* at 1404.  Resolution of this case implicates the same type of military judgment as in *Aktepe*.

Third, this Court cannot resolve this case without making a policy determination as to the propriety of efforts Peru undertook to fight the Shining Path rebels. By way of comparison, the Second Circuit Court in *Greenham Women Against Cruise Missiles v. Reagan*, 755 F.2d 34 (2d Cir. 1985), found that a non-justiciable, political question was presented by plaintiffs who challenged deployment of U.S. missiles in the U.K. The court concluded that the issues raised by the complaint could not be resolved without judicial policy-making. *Id.* at 35. The present case is like *Greenham* because Plaintiffs ask the court to decide the propriety of military aid provided to Peru, a decision entrusted to the executive branch.

Finally, in considering whether to dismiss the case, the Court should take into account the reciprocal treatment U.S. officials will receive in foreign courts. In an ATS case brought against Chinese officials for persecuting the Falun Gong, a religious group, the U.S. State Department asked the court to "take into account the potential for reciprocal treatment of the United States officials by foreign courts in efforts to challenge U.S. government policy." Statement of Interest of the United States, *Doe v. Liu Qi*, No. C 02 0672 CW, at *4-5 (N.D. Cal. Sept. 27, 2002), as a result of which the court dismissed the case on the basis of the political question doctrine. Were this Court to rule that a Peruvian soldier may be sued in a U.S. court for actions taken pursuant to his capacity as a soldier, it could be subjecting U.S. forces abroad to comparable suits in foreign jurisdictions.

3)    The Court agrees with the arguments put forth by Plaintiffs in response to Rivera Rondon.

As defendant, he has the burden of establishing the presence of a political question.  *See Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1206 (9th Cir. 2007); *Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2007 WL 2349345, at *10-11 (N.D. Cal. Aug. 14, 2007).  He has failed to carry that burden.

To begin, not "every case or controversy which touches foreign relations lies beyond judicial cognizance."  *Baker v. Carr*, 369 U.S. at 211.

Although Rivera Rondon argues that the U.S. provided training to Peru to assist in fighting the terrorists by setting up a "School of the Americas," there is no basis for connecting his individual role in the alleged massacre to any policy decision of the U.S. or to any conduct of the U.S. armed forces.  The allegedly excessive acts at Accomarca were not committed at the direction of or with knowledge and support of the U.S. government. In fact, the U.S. Department of State has condemned the killings.  In any event, U.S. courts have consistently adjudicated ATS/TVPA claims brought against foreign military personnel whose units received support from U.S. sources similar to that which Peru received from U.S. sources.  *See Cabello,* 402 F.3d at 1153.

In contrast, the cases which Rivera Rondon cites are distinguishable because each called into question the propriety of specific decisions made by the U.S. officials in conducting defense operations – issues unquestionably committed to the executive branch. Nothing of the kind is at issue here.

Finally, it can only be assumed that, in enacting the TVPA, Congress and the President were fully mindful of the potential for reciprocal treatment of U.S. forces.

The Court finds no nonjusticiable political question in this case.

## IX.
### Whether Plaintiffs' Claims Are Barred by the Act of State Doctrine

### A.

The act of state doctrine prevents courts from adjudicating a dispute if the matter involves assessing official actions of a foreign sovereign. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l.*, 493 U.S. 400, 406 (1990).  Rivera Rondon argues that the doctrine blocks Plaintiffs' litigation in this Court precisely because it would involve such an assessment.  Again, Plaintiffs assert the inapplicability of the doctrine.

### B.

1)   To determine whether the act of state doctrine applies, the Supreme Court in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428 (1964), *superseded by statute on other grounds*, 22 U.S.C. § 2370(e)(2), articulated three factors: (1) the degree of consensus regarding a certain area of international law, (2) the extent to which the issue "touch[es] . . . sharply on national nerves," and (3) whether the government that perpetrated the actions is no longer in existence.

2)   Here, says Rivera Rondon, Plaintiffs challenge an act of state that fully satisfies the three-factor test delineated by the Supreme Court.

As to the consensus regarding an area of international law, he invites the Court's attention to *Doe I. v. Israel*, 400 F. Supp. 2d 86, 113 (D.D.C. 2005), where the District of Columbia District Court refused to consider the plaintiffs' claims against Israeli military officials for harms arising from plaintiffs' detention during a political revolution because plaintiffs requested the court "to declare that they were treated illegally by Israeli defendants on Israeli soil." Such a determination, the *Doe* court said, "would offend notions of international comity and sovereignty." *Id.* Rivera Rondon suggests that any litigation by which an American court might judge the legality of treatment of Peruvian citizens by the Peruvian military on Peruvian soil would likewise offend international comity and sovereignty.

As to whether entertaining this case would "touch sharply" on Peruvian nerves, Rivera Rondon cites *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999), where the federal district court dismissed an ATS claim that would "ultimately place the Court in the position of evaluating the legitimacy of orders directed to subordinate officers" of a foreign military. The court reasoned that since U.S. courts rarely entertain suits about the propriety of U.S. military orders, it should refrain from undertaking such inquiry with respect to a foreign military. *Id.* Finally, this case requires the Court to inquire into the command structure of the Peruvian military and Rivera Rondon's authority within it, as it existed in Peru 22 years ago, under the guidance of a President, Fujimori, who is not only no longer in office, but who himself undertook to flee the country to avoid criminal prosecution.

-24-

3)     Plaintiffs take vigorous exception to Rivera Rondon's act of state argument.  They point out that the burden rests on the defendant to prove that the act of state doctrine is present in cases such as this.  *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694 (1976); *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1209 (9th Cir. 2007).  They argue that Rivera Rondon has failed to show that the doctrine is at issue here.

The Court agrees.

The act of state doctrine does not call for abstention merely because a case may require the acts of a former foreign government official to be judged.  *See W.S. Kirkpatrick & Co.*, 493 U.S. at 409 ("The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments....").  Rather, the application of the doctrine depends on a case-by-case analysis.  Moreover, actions of military officers are not *ipso facto* acts of state.  *See, e.g., Filartiga*, 630 F.2d at 889-90.

In the first place, the acts alleged in the Complaint violate universally agreed upon legal principles, involving, as they do, acts of torture, extrajudicial killing, and crimes against humanity.  Such acts, committed in violation of the norms of customary international law, are not deemed official acts for the purposes of the acts of state doctrine. *See In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493, 498 n.10 (9th Cir. 1992), *after remand*, 25 F.3d 1467, 1471-72 (9th Cir. 1994); *Filartiga*, 630 F.2d at 889.  The U.S. Senate, in passing the TVPA, specifically confirmed

-25-

that torture and similar human rights abuses can never be "public acts" for the purpose of the acts of state doctrine. S. Rep. No. 102-249, pt. 4, at 8 (1991).

Second, the present case does not touch sharply on national "nerves" of either the United States or, insofar as relevant, those of Peru.  The U.S. Government has expressly condemned what took place at Accomarca.  Thus, unlike *Doe I. v. Israel*, this case does not represent a sensitive foreign policy issue of the sort implicated in the Israeli-Palestinian conflict.  Nor is it apparent that Peru would in any sense be offended by this suit.  All the acts complained of here are illegal under Peruvian law and, most importantly, the Peruvian Government has presented a letter to the Court in effect denying the alleged acts were Peruvian acts of state.

Third, Rivera Rondon misconstrues the meaning and relevance of the third factor the Supreme Court recited in *Sabbatino*.  The fact that the government that allegedly perpetrated the challenged actions is no longer in existence makes it less likely to implicate the act of state doctrine, whereas, in contrast, a claim implicating a government still in power might be more likely to trench upon foreign policy concerns.  Since, as indicated, the Peruvian Government is today firmly on record as condemning the acts purportedly committed at Accomarca, the act of state doctrine in no way stands as a bar to prosecution of Plaintiffs' claims in this forum.

## X.
### Whether the Complaint Fails to State A Claim

### A.

Rivera Rondon argues that Plaintiffs' causes of action against him – based on aiding and abetting, conspiracy and joint criminal enterprise – are not authorized by either the ATS or the TVPA.  Again, Plaintiffs take strong issue.

The ATS grants district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  Under the TVPA, a plaintiff must allege and prove that the defendant: "(1) subject[ed] an individual to torture ... or (2) subject[ed] an individual to extrajudicial killing."  28 U.S.C. § 1350.  "Torture," under the TVPA, means "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering … is intentionally inflicted."  *Id.*

### B.

As for the conspiracy count, Rivera Rondon is alleged to have conspired with members of the Peruvian Army, a single organizational entity, which at all times was acting on behalf of Peru.  But it is, he suggests, legally impossible for an organization to conspire with itself; hence there can be no tort of conspiracy under the ATS.  *United States v. Gisehaltz*, 278 F. Supp. 434, 437 (S.D.N.Y. 1967).  Moreover, Plaintiffs have not satisfactorily pled the elements of conspiracy because they have not alleged that Rivera Rondon was aware of any plans to commit atrocities or that he took any affirmative step towards their commission.

The Complaint does not allege that <u>he</u> killed anyone, that <u>he</u> ordered any killings, or that <u>he</u> controlled or had anyone under his control who ordered or committed torture.  Nor does the Complaint allege that he was at any time aware of such abuse.  Accordingly, he does not come within the express language of the TVPA.  Plaintiffs themselves, he continues, recognize that it was Lieutenant Hurtado who ordered and/or committed the alleged atrocities; they have in fact sued and won a default judgment against him in the United States District Court for the Southern District of Florida.

Rivera Rondon further submits that there is no civil cause of action for "joint criminal enterprise."  The phrase "joint criminal enterprise" appears only four times in Supreme Court and Fourth Circuit cases, and none of the cases establish this as a civil cause of action.  In *Yousuf v. Samantar*, No. 1:04cv1360, 2007 WL 2220579 (E.D. Va. Aug. 1, 2007), *rev'd on other grounds*, 552 F.3d 371 (4th Cir. 2009), for example, a civil case, neither the district court nor the Fourth Circuit considered whether joint criminal enterprise was a valid theory of civil liability under the TVPA.  In *Hamdan v. Rumsfeld*, 548 U.S. 557, 611 n.40 (2006), *superseded by statute on other grounds*, 28 U.S.C. § 2241(e), the Supreme Court noted that "the United States Military Tribunals ... did not recognis[e] as a separate offence conspiracy to commit war crimes or crimes against humanity") (citations and internal quotations omitted).  The other two cases concerned criminal matters.  *See Fowler v. Com.*, No. 0629-97-4, 1998 WL 127484 (Va. Ct. App. 1998) and *United States v. Sapperstein*, 312 F.2d 694 (4th Cir. 1963).

-28-

Finally, even if there were a viable theory of indirect liability, it would have to be pled that the defendant knowingly became associated with the misconduct.

## C.

Plaintiffs answer each of these arguments.  To begin, they point out that the Complaint alleges that Rivera Rondon in fact acted directly at Accomarca in several respects.  Troops under his command and control fired shots, burned homes, and blocked an escape route.

In any event, numerous U.S. and international bodies have recognized causes of action under ATS/TVPA based on theories of conspiracy and aiding and abetting, and that the concept of civil recovery based on a theory of joint criminal enterprise has at least been acknowledged.

For example, in *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005), the court expressly noted that the ATS extends to conspiracy and accomplice liability claims and that the TVPA was intended to reach beyond the person who actually committed the illegal act to those persons who ordered, assisted or abetted in the violation.  As for the argument that Rivera Rondon cannot be liable for conspiracy with other members of the military because it is legally impossible to conspire with one self, no court has ever so held in the ATS/TVPA context; indeed, the holdings in cases involving military defendants have been precisely to the contrary.  *See, e.g., id.* at 1159-60 (affirming soldier's liability under ATS and TVPA for conspiring with the Chilean

government and other members of his squad to kill civilian prisoners without legal

authority and in violation of law).

      The concept of joint criminal enterprise provides for joint liability where

there is a common design to pursue a course of conduct where: "(i) the crime charged was

a natural and foreseeable consequence of the execution of [the] enterprise, and (ii) the

accused was aware that such a crime was a possible consequence of the execution of [the]

enterprise, and, with that awareness, participated in [the] enterprise." *Prosecutor v.*

*Brdjanin*, Case No. IT-99-36-T, Judgment, ¶ 265 (Sept. 1, 2004).  While these elements

sound a great deal like those for conspiracy, at least one U.S. court has accepted the

theory of joint criminal enterprise as an alternate basis for civil liability in ATS/TVPA

cases.  *See Bowoto v. Chevron Corp., et al.*, No. C 99-02506 SI, 2006 WL 2455752, at *8

n.13 (N.D. Cal. Aug. 22, 2006).

      Given these authorities, Rivera Rondon is simply wrong when he insists

that he cannot be liable because he did not personally commit the acts cited by the

Complaint. [8]

      Plaintiffs concede that in order to assert any claim against Rivera Rondon

based on indirect liability it must be alleged that he knew about the plan to commit

atrocities and knowingly assisted with it.  They do not refute the formulation in

---

[8]

      In the *Yousuf* case, while the District Court noted that joint criminal enterprise
was one of the theories of recovery pled, it did not address the viability of the theory in its
decision.  *Yousuf v. Samantar*, No. 1:04cv1360, 2007 WL 2220579, at *6 n.11 (E.D. Va. Aug. 1,
2007), *rev'd on other grounds*, 552 F.3d 371 (4th Cir. 2009).

*Khulumani v. Barclay Nat. Bank, Ltd.*, 504 F.3d 254, 288-89 (2d Cir. 2007), where the

court, applying the factors of Restatement (Second) of Torts § 876 for aiding and abetting

to an ATS claim for aiding and abetting, held that a defendant may further the violation of

an international law in one of three ways: "(1) by knowingly ... assisting a principal

tortfeasor ...; (2) by encouraging, advising ... a principal tortfeasor to commit an act while

having actual or constructive knowledge that the principal tortfeasor will violate a clearly

established customary international law norm ...; or (3) by facilitating the commission of

human rights violations by providing principal tortfeasor with the tools ... to commit those

violations with actual or constructive knowledge that those tools ... will be (or only could

be) used in connection with that purpose."  The court noted that a defendant's knowledge

of the planned wrongdoing must rise to the level of specific intent to aid in misconduct.

*Id.* at 318.  Once again, in support of this element, Plaintiffs point to the assertions in the

Complaint that Rivera Rondon attended the preliminary meeting where the Quebrada de

Huancayoc operation was discussed, oversaw the firing on villagers and burning of

homes, and set up a blockade of any escape route.

      At the same time, as to the conspiracy count, Plaintiffs stress that they are

not required to know the precise details of the conspiracy in order to satisfy the

requirements of pleading.  *See Arar v. Ashcroft*, 414 F. Supp. 2d 250, 262 (E.D.N.Y.

2006).

## D.

The Court agrees that case law recognizes causes of action for aiding and abetting, conspiracy, and joint criminal enterprise under the ATS and TVPA and that Rivera Rondon's knowledge of and participation in the human rights violations has been adequately pled.  His arguments to the contrary are rejected.

Rivera Rondon's remaining arguments need little discussion.

## XI.
## Whether Plaintiffs Are "Aliens" Within the Meaning of the ATS

Rivera Rondon contends that since Plaintiffs, in their Complaint, state that they reside in Peru, they are not residents of the United States, hence not "aliens" within the meaning of the statute. [9]  He reasons thus:  To bring a claim under the ATS, Plaintiffs must establish that they are "aliens."  28 U.S.C. § 1350.  The term "alien" is not defined in the statute, but Black's Law Dictionary defines an "alien" as a "person who resides within the borders of a country but is not a citizen or subject of that country."  Plaintiffs do not meet this definition of "alien," and therefore are ineligible to sue under the ATS.

Plaintiffs point out, correctly in the Court's view, that the Supreme Court disposed of this argument in *Rasul v. Bush*, 542 U.S. 466 (2004).  Writing for the majority, Justice Stevens stated that: "The courts of the United States have traditionally been open to <u>nonresident</u> aliens ....  And indeed, 28 U.S.C. § 1350 explicitly confers the privilege of suing for an actionable 'tort ... committed in violation of the law of nations or

---

[9]

Actions under the TVPA may be brought by a person of any nationality, *see* 28 U.S.C. § 1350 (note), and Rivera Rondon does not extend his argument to the TVPA claim.

a treaty of the United States' on aliens alone." *Id.* at 484-85 (emphasis added).  The ATS

creates federal jurisdiction over claims of "aliens alone," but makes no distinction

between resident and nonresident aliens.

## XII.
### Whether Plaintiffs Have Standing to Proceed as Personal Representatives of Their Decedents' Estates

Rivera Rondon argues that Plaintiffs lack standing to litigate because the

Complaint alleges only that they have attempted to open estates and have applied for

appointment as personal representatives of the estates of their deceased relatives, not that

they have actually opened estates and been appointed personal representatives of the

estates.

Plaintiffs, however, have confirmed to the Court that since suit was filed

they have been appointed representatives of the estates of their decedents.  Since Rivera

Rondon does not appear to press the argument, the Court finds that Plaintiffs, individually

and as representatives of their decedents' estates, have standing to proceed before the

Court.

## XIII.
### Whether Venue is Proper in This Court

Finally, Rivera Rondon argues that actions against "foreign states" must be

brought in the United States District Court for the District of Columbia unless the events

at issue occurred in the United States. 28 U.S.C. § 1391(f)(4).  Since the present claim is

really a claim against Peru inasmuch as Rivera Rondon was acting in his official capacity

as an officer in the Peruvian army carrying out orders that amounted to official policy,

venue in the District of Maryland is improper.

   This argument has already been effectively disposed of.  Rivera Rondon has

been sued in his individual, not his official capacity.  Neither the ATS nor the TVPA has

a venue provision. The Court has personal jurisdiction over him because he was a resident

of Maryland and personally served with process within this State. Additionally, as a

citizen of Peru, Rivera Rondon is an alien as to whom venue is proper in any district of

Plaintiffs' choosing. 28 U.S.C. § 1391(d) ("An alien may be sued in any district.").

## XIV.

   For all the foregoing reasons, Rivera Rondon's Motion to Dismiss is **DENIED**.

A separate Order will be **ENTERED**.


                 /s/
              **PETER J. MESSITTE**
**February 26, 2009**       **UNITED STATES DISTRICT JUDGE**

-34-